**PUBLISH**

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 96-8730
_____

D. C. Docket No. 1:93-CV-833-WBH

MICHAEL SCHAFER,

Plaintiff-Appellant,

versus

TIME, INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

**(June 8, 1998)**

Before TJOFLAT, BIRCH and MARCUS[*], Circuit Judges.

BIRCH, Circuit Judge:

This diversity case requires us to parse the often conflicting and

confusing concepts of malice as they have evolved in Georgia's

---

[*] Honorable Stanley Marcus was a U.S. District Judge for the Southern District of Florida sitting by designation as a member of this panel when this appeal was argued and taken under submission. On November 24, 1997, he took the oath of office as a United States Circuit Judge of the Eleventh Circuit.

libel laws. After instructing the jury on the applicable law and receiving a subsequent request to define "malicious defamation," the district court instructed the jury that before the plaintiff-appellant could recover for libel he had to show that the defendant-appellee made a "statement deliberately calculated to injure." We REVERSE the district court on this issue and REMAND this case for a new trial.

This appeal also presents a number of evidentiary questions, most notably whether specific instances of misconduct are admissible to prove character under Federal Rule of Evidence 405(b) in an action for libel under Georgia law. The plaintiff-appellant challenges the district court's decision to admit character evidence pursuant to Rule 405(b), as well as its decision to exclude evidence under Federal Rule of Evidence 403 on the grounds that its prejudicial effect substantially outweighed its relevance. Although these evidentiary issues are not dispositive given our decision to reverse the district court on the grounds mentioned above, they may

well arise at a second trial. Accordingly, we discuss these and a number of additional questions raised in the parties' briefs in an effort to guide the district court and the parties at retrial.

## BACKGROUND

On December 21, 1988, Pan Am Flight 103 exploded in mid-flight over Lockerbie, Scotland, causing the death of everyone on board. A terrorist's bomb was then, and is now, widely suspected to be the source of that explosion. On April 20, 1992, defendant-appellee, Time, Inc. ("Time"), published a cover story entitled "The Untold Story of Pan Am 103." The article purported to debunk the then-prevailing theory that the government of Lybia had sponsored the attack on Pan Am 103. Instead, the article posited that a Palestinian group, with connections to Syrian drug traffickers, had targeted Pan Am 103 to eliminate several of the passengers who were members of a United States counter terrorism team attempting to rescue United States hostages in Lebanon. The article claims

that these passengers had discovered an unsavory, covert relationship between the Syrian drug traffickers and a unit of the United States Central Intelligence Agency and intended to expose it upon their return to the United States.

The article further stated that an American agent, David Lovejoy, had become a double agent and had leaked information regarding the team's travel plans to forces hostile to the United States. The article included a photograph of a man identified by the following caption:

> David Lovejoy, a reported double agent for the U.S. and Iran, is alleged to have told Iranian officials that McKee [one of the U.S. agents] was booked on Flight 103.

See Schafer R. Excerpt 1, Exh. A at 31. The article went on to imply that the information Lovejoy disclosed to hostile forces led to the attack on Pan Am 103.

The photograph in question apparently became associated with the Pam Am 103 bombing in connection with a civil case filed by the

4

families of the Pan Am 103 victims.  The families' law suit claimed that Pan Am had failed to take adequate security precautions to prevent the bombing.  One of Pan Am's lawyers in that case, James Shaughnessy, filed a sworn affidavit that contained a variety of assertions about the attack that he hoped to explore through discovery in the Pan Am litigation.  Shaughnessy's affidavit alleged that unnamed sources had identified Lovejoy, the double agent whose treachery facilitated the attack on Pan Am 103, as the man in an attached photograph.  The man in the photograph, however, is Michael Schafer, the plaintiff-appellant in this case.  Time's article, therefore, erroneously identified Schafer, then working in his family's janitorial business in Austell, Georgia, both as a traitor to the United States government and a player in the bombing of Pan Am 103.[1]

---

[1] The record in this case provides no definitive explanation of how Shaughnessy obtained Schafer's picture or how Schafer became identified as David Lovejoy.  At trial, Schafer speculated that Lester Coleman, named as a source in the Time article, provided the picture to Pan Am's team of investigators and lawyers.  Schafer worked with Coleman in Beirut, Lebanon in 1985, when they were both employed by the Christian Broadcast Network, and testified that he provided Coleman with a number of pictures of himself in the course

Upon discovering his picture in the magazine, Schafer demanded and eventually received a retraction from Time. Schafer filed suit against Time, making claims under Georgia's libel laws. A jury returned a verdict in Time's favor, finding no liability for the error. After filing a motion for a new trial, which the district court denied, Schafer filed this timely appeal. Schafer challenges a number of the district court's evidentiary rulings as well as the court's recharge to the jury on the definition of "malicious" under Georgia's libel statute. He also challenges both the district court's refusal to instruct the jury that the republication of a libelous depiction constitutes libel under Georgia law and the court's decision not to charge the jury on Georgia's retraction statute.

## DISCUSSION

### I. Jury Instructions

#### A. <u>The District Court's Recharge on the Issue of Malice</u>

---

of his employment there.

After trial, the court instructed the jury on the elements of libel under Georgia law. The instructions included a recitation of Georgia's statutory definition of libel:

> [A] libel is a false <u>and malicious</u> defamation of another expressed in print, writing, pictures or signs, tending to injure the reputation of the person and exposing him to public hatred, contempt or ridicule.

R26 at 1534 (quoting O.C.G.A. § 51-5-1(a)) (emphasis added). The instructions proceeded to explain the various elements of libel and correctly instructed the jury that it need find, by a preponderance of the evidence, only that Time failed to exercise ordinary care in ascertaining whether the information it published was true or false before it could find in Schafer's favor.

After describing these elements, the district court instructed the jury on the plaintiff's claims for compensatory and punitive damages. One of Schafer's theories for compensatory damages allowed the jury to presume damages but required a clear and convincing showing of "actual malice." The court instructed the jury that:

7

> A publication is made with actual malice if it is made with knowledge that it is false or with reckless disregard of whether it is false or not. In order to demonstrate actual malice, the plaintiff must demonstrate more than just negligence by a preponderance of the evidence. He must prove by clear and convincing evidence that the challenged libel was made by the defendant with knowledge that such statements were false or that the defendant acted with reckless disregard of their falsity. Reckless disregard is a high degree of defendant's awareness of the probable falsity of the statements made.

Id. at 1539. The court also instructed the jury that it could not award punitive damages against Time unless it found "actual malice" as defined above.

The instructions, therefore, referred to the concept of malice in two different contexts: first, to describe the character of the defamatory statement and, second, to describe the lack of care the defendant employed in ascertaining the truth of the statement at issue. Consequently, the jury found itself in some confusion as to the use of malice in the instructions and asked the trial court to

8

explain its use in Georgia's statutory definition of libel. The district court answered the jury by attempting to distinguish a "malicious statement" from the concept of "actual malice" as it appeared in the instructions on damages.

> Malicious, as used in this particular paragraph . . . , is not the same as the term actual malice, which is defined for you in connection with Mr. Schafer's claim that injury to his reputation should be presumed. Instead, as used here, it, along with the word false that precedes it, describes the character of a defamation that is libelous. It denotes statements deliberately calculated to injure. In all actions for defamation, this type of malice may be inferred from the character of the charge but it may be rebutted by proof.

Id. at 1569-70 (emphasis added). After receiving this instruction, the jury resumed its deliberations and returned a verdict within the hour, deciding that Time was not liable to Schafer for libel. Schafer contends that the district court's re-charge, particularly the phrase "deliberately calculated to injure," misled the jury by improperly

requiring them to find that Time actually intended to injure Schafer by publishing the photograph in order to find liability.[2]

The trial court took the wording of its recharge to the jury directly from our decision in <u>Straw v. Chase-Revel, Inc.</u>, 813 F.2d 356 (11th Cir. 1987). In that case, we examined the issue of punitive damages awarded for a defendant's violation of Georgia's libel laws and noted that the First Amendment to the United States Constitution prohibited the award of punitive damages in a defamation case absent a showing of "actual malice." <u>Id.</u> at 360-63 (citing <u>New York Times Co. v. Sullivan</u>, 376 U.S. 254, 84 S. Ct. 710,

---

[2]  Schafer's appeal is limited to the trial court's response to the jury's question. <u>See</u> App. Reply Br. at 3. Despite Time's disingenuous statements to the contrary, Schafer did not waive this issue on appeal either by suggesting the contested language to the district court or by failing to make his objection known to the district court. In this case, during a discussion of the issue at hand, the district judge began to discuss a particularly relevant case and one of Schafer's lawyers responded that the case was <u>Straw v. Chase-Revel, Inc.</u> <u>See</u> R26 at 1562. Although rules of procedure occasionally have the unfortunate result of serving as "traps for the unwary," <u>see</u> <u>United States v. Pool</u>, 660 F.2d 547, 558 (5th Cir. Unit B, 1982), we would be loath to hold that a litigant who provides the name of the case under discussion to the court thereby foregoes the right to object to the court's decision to apply that case. The record shows that Schafer clearly communicated his position on this issue to the district court and that, after the judge gave the instruction to the jury, both parties noted their exceptions to the charge as previously stated during argument. <u>See</u> R26 at 1571.

11 L. Ed. 2d (1964) and <u>Gertz v. Robert Welch</u>, 418 U.S. 323, 94 S. Ct. 2997, 51 L. Ed. 2d 789 (1974)).  In that context, we undertook to explain the difference between "actual malice" as defined in the Supreme Court's cases and "common law malice" as it appears in section 51-5-1.  <u>Id.</u>  We explained that "actual malice" referred to the speaker's actual or constructive knowledge regarding the truth of the statement.[3]  We then explained that "malicious," as it appears in section 51-5-1, refers to the defendant's statement, and that it requires that statement to be of the type "deliberately calculated to injure."  <u>Id.</u> at 362 (citing <u>Williams v. Trust Co. of Georgia</u>, 154 Ga. App. 49, 56, 230 S.E.2d 45, 51 (1976)).

Although the <u>Straw</u> decision correctly states the law in Georgia, we acknowledge that it does so in a confusing manner. The confusion arises because a private plaintiff may recover for libel under Georgia law without proving an intentional tort.  <u>See Triangle</u>

---

[3]  As noted above, "actual malice" refers to whether the defendant either knew the statement was false or published it with a reckless disregard of whether it was false or not.  <u>Straw</u>, 813 F.2d at 361.

Publications, Inc. v. Chumley, 253 Ga. 179, 181, 317 S.E.2d 534, 536 (Ga. 1984) ("an overwhelming majority of the state courts which have addressed the question have held that a private figure plaintiff may recover for defamation on a showing of negligence on the part of the speaker or writer.") (emphasis added). Any language demanding a calculation to injure appears to conflict with this negligence standard by suggesting that the plaintiff must show that the defendant, motivated by some ill-will or "intentional hostility," actually sought or intended to injure the plaintiff.

As the Straw court explained in a footnote, however, there is no such conflict in the law because the term malicious modifies only the statement at issue; the defendant's subjective state of mind or intentions towards the defendant are irrelevant at this point in the jury's analysis. See Straw, 813 F.2d at 356 n.8; Van Gundy v. Wilson, 84 Ga. App. 429, 438-39, 66 S.E.2d 93, 101 (Ga. Ct. App. 1951). Any statement can be malicious in the sense that it is of a type calculated to injure, regardless of how the writer feels towards

12

his subject, if it suggests *injurious* (or, more plainly, bad) things about the subject to the ordinary reader. By contrast, not everything that comes from the pen of a writer who harbors a deep and personal hostility toward the subject need be of a type calculated to injure. The Straw court's explanations and limitations on the applicability of common law malice in section 51-5-1 are consistent with Georgia's cases that dismiss the defendant's private intentions towards the plaintiff as irrelevant in the defamation context. See Brooks v. Stone, 170 Ga. App. 457, 458, 317 S.E.2d 277, 279 (1984) aff'd 235 Ga. 565, 322 S.E.2d 728 (Ga. 1984) ("'In an action for defamation it is immaterial what meaning the speaker intended to convey. He may have spoken without any intention of injuring another's reputation, but if has done so he must compensate the party.'") (quoting Southeastern Newspapers v. Walker, 76 Ga. App. 57, 61, 44 S.E.2d 697, 701 (1947)). Indeed, in the typical case common law malice is presumed from the character of the defamation at issue and may only be rebutted on the issue of

13

damages or to establish the defense of privilege. See O.C.G.A. § 51-5-5; Montgomery v. Pacific Southern Co., 131 Ga. App. 712, 717, 206 S.E.2d 631, 635 (1974)("As to proof of malice, proof that the writing is false, and that it maligns the private character . . . of another, is itself evidence of legal malice.") (emphasis omitted), overruled on other grounds by, Diamond v. American Family Corp., 186 Ga. App. 681, 368 S.E.2d 350 (Ga. Ct. App. 1988)).

Moreover, only by rejecting the notion that the use of the word "malicious" in section 51-5-1 requires a showing that the defendant intended to harm the plaintiff, can we reconcile the language in Straw with our subsequent decision in Simon v. Shearson Lehman Bros., Inc., 895 F.2d 1304 (11th Cir. 1990). In that case, the district court instructed the jury that, as a matter of law, there was no evidence that the defendant in making the defamatory remark had acted with spite or ill-will towards the plaintiff. Id. at 1320. Nevertheless, we upheld the jury's decision to hold the defendant liable for slander and its award of punitive damages, because the

14

defendant's state of mind was irrelevant to the concept of malice in either context. Significantly, after discussing "actual malice" we wrote that "common law malice is presumed from the character of the defamatory statement <u>and has nothing to do with the defendant's state of mind</u>." <u>Id.</u> (emphasis added).

Unfortunately, our use of the phrase "deliberately calculated to injure" to define "malicious" as it appears in section 51-5-1, in <u>Straw</u> and <u>Simon</u>, has tended to obfuscate rather than clarify Georgia law on this issue.[4] The natural and plain connotation of the phrase "deliberately calculated to injure" suggests that the jury must find that the defendant subjectively intended to injure the plaintiff as a prerequisite for liability. Without the benefit of the attendant explanations and limitations described at length above, the definition is incomplete and misleading. The trial court's instruction to the jury in this case, although literally accurate, in the

---

[4] The district court noted precisely this point below: "The law of defamation is by any test confusing and precious little has been done by the courts, trial or appellate, to fix understandable instructions." R13-134 at 2 n.1.

15

context presented here, failed to properly guide the jury in its deliberations and likely resulted in a legally misguided verdict.

Our review of a district court's charges to the jury is deferential, and the trial judge is entitled to wide discretion over the style and wording employed as long as the instructions accurately reflect the law. See Carter v. Decisionone Corp., 122 F.3d 997, 1005 (11th Cir. 1997) (per curiam). We must examine "'whether the jury charges, considered as a whole, sufficiently instructed the jury so that the jurors understood the issues and were not misled.'" Id. (quoting Wilkinson v. Carnival Cruise Lines, Inc., 920 F.2d 1560, 1569 (11th Cir. 1991)). Finally, we will reverse the district court only if "we are 'left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations.'" Id. (quoting Johnson v. Bryant, 671 F.2d 1276, 1280 (11th Cir. 1982).

As noted above, there can be no doubt that the trial court's instructions on this issue were faithful to the language of our opinion in Straw. Nevertheless, as that language, standing alone without

16

lengthy explanation, carries with it a powerful tendency to mislead and confuse even those experienced in the law of libel, we cannot say that the charge, as modified by the re-charge, adequately focused the jury's attention on the proper factual issue. As the Georgia Court of Appeals recently observed in a similar libel case, an instruction "'which confuses the issues in the case and injects into the case issues not made by the pleadings or the evidence is presumptively harmful to the losing party.'" <u>Davis v. Shavers</u>, 225 Ga. App. 497, 501, 484 S.E.2d 243, 248 (Ga. Ct. App. 1997) (internal quotation marks omitted). The jury's question on this point and its subsequent decision, in obvious reliance on the court's re-charge, serves only to underscore the concerns voiced above. As a result, we are left with "an ineradicable doubt" that the jury found for the defendant because the plaintiff had not proved Time deliberately intended to injure him. Accordingly, we reverse and remand this case for a new trial.[5] Although our disposition of this

---

[5] As a result, we decline to address the merits of Schafer's related but undeveloped suggestion that an instruction on the issue

issue resolves this appeal, we address Schafer's remaining challenges to the jury instructions to assist the district court and the parties when these issues inevitably are resurrected upon retrial.

## B.   Refusal to Instruct the Jury on Republication

Next, Schafer challenges the district court's decision not to include his proposed instruction that the unprivileged republication of a libelous statement may constitute libel under Georgia law.  We review a district court's refusal to include a requested jury instruction for an abuse of discretion.  See United States v. Condon, 132 F.3d 653, 656 (11th Cir. 1998).

A defendant's republication of a libelous statement is a tort under Georgia law, "independent and separate from the first publication."  Peacock v. Retail Credit Co., 302 F. Supp. 418, 421

---

of malice is misplaced when the plaintiff has shown libel per se. Compare Rosanova v. Playboy Enter., Inc., 411 F. Supp. 440, 445 (S.D.Ga. 1976) aff'd 580 F.2d 859 (5th Cir.1978) ("Libel per se is a publication charging that one is guilty of a crime, dishonesty or immorality.  To be actionable the statement must be both false and malicious.") with Davis, 225 Ga. App. at 500-01, 484 S.E.2d at 247-48 (implying, without supporting authority, that an instruction on common law malice was inapplicable to a case involving libel per se).

(N.D. Ga. 1969), aff'd, 429 F.2d 31, (quoting Howe v. Bradstreet Co., 135 Ga. 564, 565, 69 S.E. 1082, (1911)). Liability in such a situation, of course, requires the plaintiff to show that the defendant's republication of the libelous statement itself satisfies all the elements of the tort of libel, independent and apart from the actions of the original act of libel. Cf. Howe, 135 Ga. at 565-66 (distinguishing between joint-publishers and a republisher). In this case, therefore, Schafer must prove that Time published his photograph without exercising reasonable care as to whether it had correctly identified the man in the picture as David Lovejoy; presumably it would be insufficient to rely on the negligence of the person who filed the affidavit in the Pan Am case.

Georgia's statutes provide an affirmative defense of privilege when the libel defendant's statement constitutes a "fair and honest" report of judicial bodies or court proceedings. See O.C.G.A. § 51-5-7(5 & 6); Atlanta Journal Co. v. Doyal, 82 Ga. App. 321, 328, 60 S.E.2d 802, 810 (Ga. Ct. App. 1950). At the conclusion of the

19

evidence, the district court denied Time's motion for judgment as a matter of law, finding that Time had not established that its republication of Schafer's photograph from an affidavit filed in the Pan Am 103 case was "fair and honest" as a matter of law.[6] Despite the court's ruling that Time was not entitled to the privilege as a matter of law, Time presented evidence that the photograph came from a sworn affidavit, filed in the Pan Am case, as well as its reporter's efforts to confirm the identity of the man in the picture. During closing argument, Time emphasized this evidence in an effort to argue that Time had exercised reasonable care before publishing the picture. Schafer argues that this tactic effectively nullified the trial court's decision on privilege and that the jury should have been instructed that the source of the photograph was legally irrelevant to the question of Time's negligence.

---

[6] Schafer makes a curious argument that Time's attempt to rely on the privilege defense, which is one of "confession and avoidance" somehow amounts to an admission of libel. Although resort to the privilege defense constitutes "admission of publication and bona fide,"it does not constitute an admission of liability. See Auer v. Black, 163 Ga. App. 787, 789, 294 S.E.2d 616, 618-19 (Ga. Ct. App. 1982).

20

An inquiry into negligence requires the jury to determine whether the defendant acted reasonably under the circumstances. The source of a particular piece of information is relevant to the facts and circumstances that confront a defendant that republishes information in the regular course of its business. Similarly, the steps that such a defendant took to verify the identity of the man in the photograph are similarly relevant to the question of negligence. See Stange v. Cox Enter., 211 Ga. App. 731, 733-34, 440 S.E.2d 503, 506-07 (1994) (discussing the steps a publisher took to check the accuracy of a story and editorial). Ironically, Schafer's own prosecution of this cause of action, in which he has argued that Time should never have published its story because it should have known that the sources for much of the information in the story were thoroughly unreliable, makes this point quite plainly.

Moreover, Schafer's contention that the jury was unaware of the fact that a republication of a libelous statement could itself constitute libel is unsupportable. As Time points out, the district

court instructed the jury that publication of the defamatory statement was an element of the charge. The very fact that the court submitted this case to the jury and asked it to decide whether Time's republication of the photograph made it liable to Schafer for libel demonstrates the jury could not have been misled into accepting the source of the photograph as a complete defense. As a result, we see no error in the district court's decision not to include Schafer's requested charge.

## C.    Refusal to Instruct on Georgia's Retraction Statute

Finally, Schafer argues that the trial court erred by failing to include language instructing the jury on Georgia's retraction statute. The statute in question, O.C.G.A. § 51-5-11, permits a libel defendant to limit its potential liability by printing a retraction that conforms with several enumerated requirements.[7] The parties agree

---

[7]   In pertinent part, the statute provides:

(b) In any such action, the defendant may allege and give proof of the following matters as applicable:
    (1) (A)   That the matter alleged to have been published and to be libelous was published without malice;
        (B)   That the defendant, in a regular issue of

22

that Time's correction, printed over a month after Schafer gave written demand for a retraction, did not comply with section 51-5-11(b)(1).

Schafer argues that the court should have instructed the jury that the statute sets out the minimum requirements for a legally sufficient retraction. This argument, however, contradicts the plain language of Georgia's statute. Section 51-5-11 allows a libel defendant the option of limiting its liability for compensatory and punitive damages by adhering to a number of specific conditions. Time's failure to avail itself of the statute's protection did not make its efforts at correction "legally insufficient" either in the sense that

```
         the newspaper or other publication in question,
         within seven days after receiving written demand,
         or in the next regular issue of the newspaper or
         other publication following receipt of the demand
         if the next regular issue was not published within
         seven days after receiving the demand, corrected
         and retracted the allegedly libelous statement in
         as conspicuous and public a manner as that in which
         the alleged libelous statement was published . . .
         .
              . . . .
    (c) Upon proof of the facts specified in paragraph (1) .
    . . the plaintiff shall not be entitled to any punitive
    damages and the defendant shall be liable only to pay
    actual damages. . . .
```

O.C.G.A. § 51-5-11.

the jury could not consider a noncompliant correction as it relates to the issues before it on the libel charge, or in the sense that such a correction gave rise to some form of liability, see e.g., McFarlane v. Sheridan Square Press, Inc., 91 F.3d 1501, 1515 (D.C. Cir. 1996) (finding no authority for a "duty to retract"). Schafer cites no case that lends credibility to this reading of the statute, and our own research has uncovered no authority that supports his position.

As a result, section 51-5-11 had no bearing on the issues before the jury,[8] and the court correctly declined to include an

---

[8] Schafer correctly points out that a number of courts have discussed a refusal to retract or a defendant's publication of a retraction in bad faith as evidence of actual malice. See Augusta Chronicle Publ'g Co. v. Arrington, 42 Ga. App. 746, 157 S.E. 394 (Ga. Ct. App. 1930); Southern Bell Tel. & Tel. v. Coastal Transmission Serv., Inc., 167 Ga. App. 611, 307 S.E.2d 83 (Ga. Ct. App. 1983). In none of those cases, however, did the defendant's failure to publish a retraction within the letter of a statute such as section 51-5-11 constitute evidence of such bad faith. See e.g., Brown v. Fawcett Pub., Inc., 196 So.2d 465, 473 (Fla. Ct. App. 1965) (defendant's retraction of stories accusing the plaintiff of sodomy and murder, which did not appear for more than a year after the grand jury found insufficient evidence to support the charges, was evidence of actual malice). As a result, it would have been error for the court to instruct the jury that a retraction that failed to comply with the statute necessarily constituted evidence of actual malice. See Bandido's Inc., v. Journal Gazette Co., 574 N.E.2d 324, 328 (Ind. Ct. App. 1991).

24

instruction on the statute. Cf. Davis, 484 S.E.2d at 248 (noting the error of including a charge that injects into a case issues not relevant to the issues made by the pleadings and evidence). Instead, the district court correctly instructed the jury that it could consider the timing, content, and prominence of Time's correction in its deliberations regarding whether Time had acted to limit Schafer's damages. Moreover, the district court's instruction that Time's failure to publish a correction that satisfied Schafer was not, by itself, a basis for awarding damages was also a proper and accurate statement of the law.

## II    Evidentiary Issues

Schafer also argues that the district court committed reversible error by permitting Time's counsel to question Schafer regarding a number of "specific acts of misconduct" during cross-examination and by excluding from evidence a memorandum

discussing the credibility of Time's sources for the Pan Am 103 article. We review the district court's legal decision to apply a particular rule of evidence <u>de novo</u> but its decision to admit or exclude particular evidence under that rule for an abuse of discretion. <u>Cf.</u> <u>Carmichael v. Samyang Tire, Inc.</u>, 131 F.3d 1433, 1435 (11th Cir. 1997). We will not overturn an evidentiary ruling unless the complaining party has shown a "substantial prejudicial effect." <u>See</u> <u>Judd v. Rodman</u>, 105 F.3d 1339, 1341 (11th Cir. 1997).

A.    <u>Specific Acts of Misconduct</u>

Evidence of a person's character is viewed with some suspicion under the law and generally is disfavored in the Federal Rules of Evidence. <u>See</u> Fed. R. Evid. 404 (character evidence generally inadmissible to prove conforming conduct). In an action for defamation or libel, however, the issue of the plaintiff's reputation and character scarcely can be avoided because the plaintiff typically seeks to recover compensation for damage to his

or her reputation. Even in such cases, however, the rules of evidence prescribe particular methods for broaching the issue of character. See Fed. R. Evid. 405 ("Methods of Proving Character").

Before trial, the district court instructed the parties that Time would not be permitted to introduce and explore a number of specific acts and events in Schafer's life as they were irrelevant to the issues before the jury. At that time, however, the district court warned both parties that the court would revisit the character issue to the extent that particular acts and events were shown to be relevant to the question of damages or how Schafer's picture might have become associated with the Pan Am case. During the course of the trial, the district court made a preliminary ruling permitting Time to explore selective incidents and acts in Schafer's background but excluding evidence of others. Specifically, the district court ruled that Time would be permitted to question Schafer about a felony conviction, a possible violation

27

of his subsequent parole, convictions for driving under the influence, an arrest for writing a bad check, failure to file tax returns, failure to pay alimony and child support, and evidence concerning Schafer's efforts to change his name and social security number.[9] Schafer attacks the district court's ruling and argues that these specific acts were inadmissible.

The Federal Rules of Evidence detail the circumstances under which character evidence is admissible and the methods available for presenting such evidence. In all cases in which character evidence is admissible a party may offer reputation or opinion testimony on the issue of a person's character. See Fed. R. Evid. 405(a).[10] Only in cases in which a person's character is

---

[9] Schafer changed his name from Michael Franks at the age of 32 when he discovered that he had never legally been adopted. See R21 at 4-5. The issue was relevant at trial because "Michael Franks" was one of Lovejoy's purported aliases.

[10] Rule 405 provides the following methods for introducing character evidence:

> (a) Reputation or opinion. In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into relevant specific instances of conduct.

"an essential element of a charge, claim or defense," however, may a party offer evidence of specific instances of conduct. See Fed. R. Evid. 405(b).[11]

Character evidence does not constitute an "essential element" of a claim or charge unless it alters the rights and liabilities of the parties under the substantive law. See United States v. Keiser, 57 F.3d 847, 856 & n.20 (9th Cir. 1995); Perrin v. Anderson, 784 F.2d 1040, 1045 (10th Cir. 1986) (citing McCormick on Evidence § 187 at 551 (3d ed. 1984)). Our

---

(b) Specific instances of conduct. In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of that person's conduct.

Fed. R. Evid. 405.

[11] The advisory committee notes to Rule 405 provide some insight as to the rule's limitations on the use of specific acts to prove character:

Of the three methods of proving character provided by the rule, evidence of specific instances of conduct is the most convincing. At the same time it possesses the greatest capacity to arouse prejudice, to confuse, to surprise, and to consume time. Consequently the rule confines the use of evidence of this kind to cases in which character is, in the strict sense, in issue and hence deserving of a searching inquiry.

Fed. R. Evid. 405, adv. comm. note.

determination of whether character constitutes an essential element requires us to examine the "authoritative statutory or common law statement of the elements of the prima facie case and defenses." Keiser, 57 F.3d at 856 n.20.[12] The advisory committee's notes to the Federal Rules of Evidence provide two examples in which character evidence constitutes such an essential element: "[1] the chastity of a victim under a statute specifying her chastity as an element of the crime of seduction, or [2] the competency of the driver in an action for negligently entrusting a motor vehicle to an incompetent driver." Fed. R. Evid. 404(a) adv. comm. note (explaining that Rule 404 does not exclude such evidence because it is not offered to prove conduct consistent with character). In addition to these examples, a charge of defamation or libel commonly makes damage to the victim's reputation or character an essential element of the case.

---

[12] As the Keiser court noted, this inquiry is a legal rather than factual one, see Keiser, 57 F.3d at 856 n.20, and as a result, our review of the district court's decision on this matter is de novo. Id. at 852 n.6.

See *e.g.*, Johnson v. Pistilli, No. 95 C 6424, (N.D. Ill. Oct. 8, 1996) ("It is rare that character is an essential element. The typical example of such a case is defamation where injury to reputation must be proven."); see also Michael H. Graham, Handbook of Federal Evidence § 405.2 (4th ed. 1996). Georgia law confirms that an assertion of damage to reputation in a libel case makes the plaintiff's character an issue under the substantive law. See Ajouelo v. Auto-Soler Co., 61 Ga. App. 216, 6 S.E.2d 415, 419 (1939) ("It is generally held that the foundation of an action for defamation is the injury done to the reputation, that is, injury to character in the opinion of others arising from publication . . . ."); Redfearn v. Thompson, 10 Ga. App. 550, 555 (1912) (permitting the jury to consider plaintiff's bad reputation in mitigation of damages). Since the plaintiff's character is substantively at issue in a libel case under Georgia law, Rule 405(b) permits the admission of evidence regarding specific

instances of the plaintiff's conduct on that issue.[13]  See Perrin,

784 F.2d at 1045; Government of the Virgin Islands v. Grant, 775

F.2d 508, 511 n.4 (3d Cir. 1985); cf. Longmire v. Alabama State

Univ., 151 F.R.D. 414, 419 (M.D. Al. 1992) (permitting discovery

regarding specific incidents because the libel plaintiff put his

character in issue); accord Ex Parte Healthsouth Corp., No.

1961758, 1970010, 2-3 (Ala. 1997) (permitting discovery of such

evidence in a libel case under a state rule of evidence identical to

Fed. R. Evid. 405(b)); Daniels v. Wal-Mart Stores, Inc., 634 So.2d

88, 93 (Miss. 1993) (making a similar observation in dicta).  Given

---

[13]    Schafer's argument that this analysis puts "the horse before the cart" because Rule 404 governs the question of whether character evidence is admissible is unavailing.  Rule 404 forbids the use of character evidence to prove "action in conformity therewith on a particular occasion," or as the advisory committee's notes describe it, the "circumstantial" use of character evidence. See Fed. R. Evid. 404(a) adv. comm. notes.  Rule 404 does not bar the admission of character evidence when character or a particular character trait is actually at issue.  Id.  Rule 404 permits the character evidence in dispute here, and Rule 405 governs the acceptable methods for introducing it.

For the sake of completing the analysis, however, we note that even though evidence of specific acts is admissible to prove character in a libel case under Rule 405(b), a district court must still determine whether such acts pass muster under Federal Rule of Evidence 401 (relevance) and Federal Rule of Evidence 403 (prejudice).  See United States v. Barry, 814 F.2d 1400, 1403-04 & n.6 (9th Cir. 1987). The district court's decision to admit the evidence at issue here cannot be said to constitute an abuse of discretion under these rules.

32

the plain language of Rule 405(b)), Schafer's arguments that specific acts remain inadmissible to prove character in an action for libel are unpersuasive.[14]

Accordingly, we find no error in Time's exploration of these and other issues of character during its cross-examination of Schafer. To the extent that Time strayed from the specific issues of character enumerated in the district court's preliminary ruling, including Time's questions regarding Schafer's work for Soldier of Fortune magazine,[15] Time's questions fell within the scope of

---

[14]    Schafer cites Butts v. Curtis Publ'g Co., 225 F. Supp. 916 (N.D. Ga. 1964) aff'd, 351 F.2d 702 (5th Cir. 1965), 388 U.S. 130, 187 S. Ct. 1975, 18 L. Ed. 2d 1094 (1967), a case decided before the Federal Rules of Evidence entered into effect on July 1, 1973, for the proposition that specific incidents of prior conduct are not admissible to prove character in a libel case. Although the district court in that case confirmed that character was an essential issue in a libel case under Georgia law and that a defendant could demonstrate that the "plaintiff's general character is bad," it held that both federal and state case law prevented the defendant from relying on specific acts or general rumors to do so. Id. at 921. The plain language of Rule 405(b), however, contradicts Butts by expressly permitting the admission of specific acts when character is an essential element of the case. Schafer citation to Sharon v. Time, Inc., 103 F.R.D. 86 (S.D.N.Y. 1984), a case that does not refer to Rule 405(b), does not require a different result.

[15]    It strikes us that the district court could have permitted Time to challenge Schafer's direct testimony about his travels and work history without reference to the name of this particular publication, the variable to which Schafer apparently attaches prejudice. Given the parties' failure to suggest such an option,

33

Federal Rules of Evidence 405(a) and 608(b).[16] We cannot say that the district court's decisions on these matters rose to the level of an abuse of discretion, nor can we say that Schafer suffered a "substantial prejudicial effect." See Rodman, 105 F.3d at 1341.

### B.    Exclusion of the Pondisco Memorandum

Next, Schafer attacks the district court's decision to exclude from evidence a July 22, 1992 memorandum prepared by Robert Pondisco, Time's Public Affairs Director. The memorandum discusses some of the repercussions of Time's publication of the Pan Am 103 story and addresses a number of charges that the sources for the article obviously were unreliable. Significantly, the memorandum does not mention the photograph at issue in this case but confines its observations to the general outlines of Time's story. Schafer argues that the district court should have

---

however, we cannot find that the district court abused its discretion in this matter.

[16]    Rule 405(a) permits cross examination regarding specific instances of conduct when character evidence is admissible. Rule 608(b) permits cross-examination regarding specific instances of conduct to attack the credibility of a witness.

admitted the memorandum into evidence. Alternatively, he argues that the district court erred by refusing to allow Schafer's expert witness to discuss the memorandum to reveal the factual basis of his testimony.[17]

The district court noted that the memorandum contained hearsay and excluded the memorandum after finding that prejudice substantially outweighed the document's marginal relevance. Federal Rule of Evidence 401 sets out the standard for determining whether evidence is relevant to an issue before the court;[18] Federal Rule of Evidence 403 governs the decision to

_____

[17] We decline to address Schafer's contention that the district court should have permitted Schafer to use the memorandum to cross-examine Time's witnesses and impeach their credibility. Schafer has not pointed us to anything in the record that suggests that Schafer requested an opportunity to use the Pondisco memorandum for this purpose or that the district court denied any such request. See R25 at 1266-67 (Time's expert witness claimed no reliance on the memorandum when cross-examined by Schafer pursuant to Fed. R. Evid. 705); R23 at 961-1001 (direct and cross-examination of John Stacks, reflecting no mention of the Pondisco memorandum). Ordinarily, we will not consider objections made for the first time on appeal. See United States v. Prichett, 898 F.2d 130, 131 (11th Cir. 1990) (per curiam).

[18] The rule provides:
"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

exclude relevant evidence when "its probative value is substantially outweighed by the danger of unfair prejudice"[19]. We review the district court's exclusion of this evidence under Rule 403 for a clear abuse of discretion.[20]  See United States v. Gilliard, No. 96-9459, (11th Cir. Jan. 21, 1998).

Schafer correctly points out that the memorandum establishes that the article was controversial at Time before it was published, that the sources for the story may not have been credible, and that Time's publication of the report may have violated internal policies and procedures.  The memorandum, however, does not mention Time's decision to publish the

---

Fed. R. Evid. 401.

[19]  Rule 403 provides:
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.
Fed. R. Evid. 403.

[20]  Since we find that the district court did not clearly abuse its discretion by excluding the memorandum under Rule 403, we need not address the parties' arguments regarding the several levels of hearsay present in the document.

particular photograph at issue or its efforts to verify the identity of the man pictured in that photograph. As a result, the memorandum was of marginal relevance to Schafer's claims. Evidence that tends to show the general thrust of the article was false and lacked credibility has virtually no direct impact on Schafer's theory of the case. Schafer's claim for libel arose out of Time's publication of his photograph in connection with an alleged plot to destroy Pan Am 103 and kill hundreds of innocent travelers. Even if Time's theory of the attack had been correct in every other detail, Schafer's claim for libel would remain intact because the article incorrectly identified him as David Lovejoy – an alleged participant in that conspiracy.[21] The only tangential relevance the memorandum had to the issues before the court on Schafer's claims, therefore, depended on an inference that the problems described in the memorandum extended to Time's

---

[21] In fact, the damage to Schafer, incorrectly identified as David Lovejoy because of the photograph, would no doubt have been much more severe if the rest of the article had turned out to be accurate.

37

measures to verify the identity of the man in the offending picture. Although we cannot dismiss the memorandum as completely irrelevant, neither can we fault the district court for giving it little weight.

Moreover, the potential for prejudice from such a memorandum is plain. Schafer sought to use the memorandum to show that Time's publication of the entire article constituted a lapse in judgment and professional standards in the hope that the jury would attribute the same lack of care to Time's decision to publish his photograph. The district court correctly concluded that such a tactic could mislead the jury and confuse the issues before them. Accordingly, we discern no abuse of discretion in the district court's decision to exclude the Pondisco memorandum under Rule 403.

Schafer also argues that even if the district court correctly excluded the Pondisco memorandum on the foregoing grounds, the memorandum should have been admitted to provide the

factual basis for the testimony of Schafer's expert witness. Edward Diamond testified on Schafer's behalf regarding Time's decision to publish the Pan Am 103 article. In particular, Diamond discussed a number of problems and issues that should have led Time to delay its publication of the story or forego its publication altogether. Diamond also discussed some reasons why Time should not have published Schafer's photograph in connection with the story. Schafer contends that the Pondisco memorandum provided at least some of the factual basis for Diamond's testimony and correctly notes that, in some circumstances, Federal Rule of Evidence 703 permits an expert to rely on facts or data that would not be admissible at trial.[22] As we have explained, however:

---

[22] Rule 703 provides:
    The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.
Fed. R. Evid. 703.

> Rule 703 . . . is not an open door to all inadmissible evidence disguised as expert opinion. Although experts are sometimes allowed to refer to [inadmissible] . . . evidence as a basis for their testimony, such [inadmissible evidence] . . . must be the type of evidence reasonably relied upon by experts in the particular field in forming opinions or inferences on the subject.

United States v. Scrima, 819 F.2d 996, 1002 (11th Cir. 1987). The Pondisco memorandum is hardly the type of learned treatise or statistical data, the prototypical subjects of Rule 703 decisions, that an expert might rely upon within the ordinary course of his or her profession. See Fed. R. Evid. 703 adv. comm. note. Nor has Schafer made any attempt to demonstrate how this isolated memorandum could be of the type an expert typically relies on to bring it within Rule 703. As a result, the district court did not err by preventing Diamond from referring to the memorandum to defend his testimony upon cross examination.[23]

---

[23] Moreover, we are at a loss to identify how Schafer may have suffered any substantial prejudice from the district court's ruling on this matter. Diamond's only attempt to rely on the Pondisco memorandum during cross-examination came when Time's counsel questioned him about his earlier assertion that a London newspaper

## CONCLUSION

Schafer asks that we reverse the district court's evidentiary rulings and correct its instructions to the jury. We find no error in the district court's decision to admit specific instances of conduct to prove character under Federal Rule of Evidence 405(b) and its decision to exclude the Pondisco memorandum under Federal Rule of Evidence Rule 403. We also discern no error in the district court's refusal either to give Schafer's proposed instruction on republication of libel or to charge the jury on Georgia's retraction statute. We hold, however, that the district court's re-charge to the jury in the context of this case was in error and that this error raised a substantial likelihood that the jury misapprehended the law as it deliberated on the merits of the case. We, therefore, reverse the jury's verdict in

---

had published an article making similar allegations regarding the bombing of Pan Am 103 and had been forced to retract the story. Diamond actually held up the offending memorandum as a source for this piece of information before Time's counsel could object. See R20 at 729-30. As a result, Schafer's contention that this isolated incident could have led the jury to believe that Diamond was drawing his opinions from "thin air" is unpersuasive.

41

Time's favor and remand for a new trial in accordance with this opinion.  REVERSED and REMANDED.